Kane Moon (SBN 249834)
E-mail: kmoon@moonlawgroup.com
Jacquelyne VanEmmerik (SBN 339338)
E-mail: jvanemmerik@moonlawgroup.com
Nichelle Christopherson (SBN 349221)
E-mail: nchristopherson@moonlawgroup.com
**MOON LAW GROUP, PC**
725 S. Figueroa St., 31st Floor
Los Angeles, California 90017
Telephone: (213) 232-3128
Facsimile: (213) 232-3125

*Attorneys for Plaintiff, Elizabeth Xatruch*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

ELIZABETH XATRUCH, individually, and on behalf of all others similarly situated,

*Plaintiff*,

vs.

RAISING CANE'S USA, L.L.C.; and DOES 1 through 10, inclusive,

*Defendants*.

Case No.: 2:25−CV−03341−DJC−SCR

[Honorable Daniel J. Calabretta, Courtroom 7]

**PLAINTIFF ELIZABETH XATRUCH'S OPPOSITION TO DEFENDANT RAISING CANE'S USA, L.C.C.'S MOTION TO COMPEL ARBITRATION**

[*Filed concurrently with the supporting Declaration of Nichelle Christopherson; and Declaration of Plaintiff Elizabeth Xatruch*]

Date: February 5, 2026
Time: 1:30 p.m.
Courtroom: 7

Action filed: October 10, 2025
Trial date: Not set.

TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENTS .......... 1

A. DEFENDANT'S MOTION SHOULD BE SUMMARILY DENIED, AS DEFENDANT FAILED TO SATISFY THIS COURT'S PRE-FILING MEET-AND-CONFER REQUIREMENTS .......... 1

B. DEFENDANT HAS FAILED TO ESTABLISH PLAINTIFF ENTERED INTO THE AGREEMENTS BY A PREPONDERANCE OF THE EVIDENCE .......... 3

C. THE AGREEMENTS ARE PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE .......... 5

1. THE AGREEMENTS ARE PROCEDURALLY UNCONSCIONABLE .......... 6

2. THE AGREEMENTS ARE SUBSTANTIVELY UNCONSCIONABLE .......... 8

D. THE MAD PROCEDURES IN THE 2025 AGREEMENT UNDERMINE THE CLASS ACTION/COLLECTIVE ACTION WAIVER AND PRECLUDE ITS ENFORCEMENT .......... 12

E. THE COURT, NOT THE ARBITRATOR, MUST CONSIDER THE QUESTION OF ARBITRABILITY13

F. THE AGREEMENTS CANNOT BE SALVAGED THROUGH SEVERANCE .......... 15

G. DEFENDANT'S CONTEMPORANEOUS REQUEST TO STAY THIS MATTER IS IMPROPER AND PREMATURE .......... 16

III. CONCLUSION .......... 17

TABLE OF AUTHORITIES

**CASES**

*Armendariz v. Foundation Health Psychcare Servs., Inc.* 24 Cal.4th 83 (2020) 6, 9, 10, 12, 15
*Baxter v. Genworth North America Corp.*, 16 Cal.App.5th 713 (2017) ......................6, 8
*Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796 (N.D. Cal. 2004) ........................... 3
*Cronus Investments, Inc. v. Concierge Services*, 35 Cal.4th 376 (2005) .................... 5
*Davis v. Kozak*, 53 Cal.App.5th 897 (2020)................................................................ 6
*Faulk v. JELD-WEN, Inc.*, No. 24-4078, 2025 WL 3183012 (9th Cir. Nov. 14, 2025) . 1, 16
*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)..................................14
*Fitz v. NCR Corp.*, 118 Cal.App.4th 702, 715–17 (2004).....................................15, 16
*Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997 (2023)................................14, 15
*Isabel Garcia v. Stoneledge Furniture LLC*, 102 Cal. App. 5th 41 (2024)................... 4
*Lamps Plus, Inc. v. Varela*, 587 U.S. 176 (2019).......................................................13
*Lhotka v. Geographic Expeditions, Inc.*, 181 Cal.App.4th 816 (2010) ......................... 6
*Lucas v. Gund, Inc.*, 450 F.Supp.2d 1125 (2006) ......................................................12
*Malone v. Superior Court (California Bank & Trust)*, 226 Cal.App.4th 1551 (2014)..... 6
*Moncharsh v. Heily & Blase*, 3 Cal.4th 1 (1992) .........................................................12
*Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (2017) ............................. 4
*Penilla v. Westmont Corp.*, 3 Cal.App.5th 205 (2016) ................................................ 6
*Ramirez v. Charter Communications, Inc.*, 16 Cal.5th 478 (2024) .............................10
*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010).................................13, 14
*Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025)...................................16
*Ruiz v. Moss Bros. Auto Group, Inc.*, 232 Cal. App. 4th 836 (2014) ........................... 4
*Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899 (2015)................................8, 9
*Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109 (2013) ..................................... 8
*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136 (1991)............. 4

*Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639 (2022) .......................................... 6
*Wang v. Life Ins. Co. of the Southwest*, 2019 WL 13201949 (N.D. Cal. Dec. 19, 2019) ........................................................................................................ 4

**STATUTES**

9 U.S.C. § 4 .......................................................................................... 12
Civ. Code § 1633.9(a) ............................................................................. 5
Civil Code § 1633.9(a) ............................................................................ 4

## I. INTRODUCTION

Defendant Raising Cane's USA, L.L.C's (hereinafter, "Defendant") Motion to Compel Arbitration (hereinafter, "Defendant's Motion" or "Motion") requests this Court to compel arbitration of Plaintiff Elizabeth Xatruch's (hereinafter, "Plaintiff") (Plaintiff with Defendant, the "Parties") individual claims and stay Plaintiff's non-individual claims pending completion of arbitration. Defendant's Motion should be denied in its entirety: Defendant failed to satisfy the pre-filing meet-and-confer requirements of the Court's Initial Standing Order; Defendant has failed to establish by a preponderance of the evidence that any arbitration agreement binding Plaintiff was ever formed; even assuming Plaintiff was bound by an arbitration agreement, the 2024 and 2025 Mutual Agreements to Arbitrate Claims (hereinafter collectively, "Agreements," or separately, "2024 Agreement" and "2025 Agreement") that Defendant seeks to enforce are permeated with procedural and substantive unconscionability, rendering them wholly unenforceable and unsalvageable through severance; the MAD Procedures in the 2025 Agreement preclude enforcement of its Class/Collective Action Waiver; and the delegation clauses in the Agreements are unenforceable. If this Court compels Plaintiff's individual claims to arbitration, a stay would be improper and premature under *Faulk v. JELD-WEN, Inc.*, No. 24-4078, 2025 WL 3183012 (9th Cir. Nov. 14, 2025), which holds that the elimination of all class allegations requires remand absent an independent jurisdictional basis—none of which exists here.

## II. ARGUMENTS

### A. Defendant's Motion Should Be Summarily Denied, As Defendant Failed To Satisfy This Court's Pre-Filing Meet-And-Confer Requirements

Defendant's Motion should be summarily denied, as Defendant indisputably failed to satisfy its meet-and-confer obligations prior to filing its Motion. This Court directed the Parties to *"engage in a pre-filing meet and confer to discuss thoroughly the substance of the contemplated motion and any potential resolution. Counsel should resolve minor procedural or other non substantive matters during the meet and confer process so that briefing on motions that proceed to hearing is directed only to those substantive issues requiring*

*resolution by the Court.*" ECF No. 5, Judge Daniel J. Calabretta's Amended Civil Standing Order, p.2:17-26 ("Standing Order"). The Standing Order further provides that "*failure to comply with this requirement* ***will*** *result in the motion being summarily denied without prejudice.*" *Id.* at 24-26.

It is undeniable that Defendant did not meet these requirements. On Friday, November 7, 2025, at 5:28 p.m., Plaintiff's counsel received an initial email from Defendant's counsel with two unsigned arbitration agreements attached. *Christopherson Decl.*, ¶ 5; ECF No. 6-2, *Declaration of Ashley Wynn* (hereinafter, "*Wynn Decl.*"), Exhs. C-D. On November 11, 2025, Plaintiff's counsel reviewed the agreements and observed that neither contained Plaintiff's signature, and on November 12, 2025, she attempted to contact Plaintiff but was unable to reach her. *Christopherson Decl.*, ¶¶ 6–7. On November 15, 2025, Defendant's counsel inquired whether Plaintiff would stipulate to arbitration or oppose a motion to compel and requested Plaintiff's anticipated bases for opposition. *Christopherson Decl.*, ¶ 8. Plaintiff's counsel responded on November 17, noting she was still reviewing the agreements and that they were unsigned, and requesting any signed versions. *Christopherson Decl.*, ¶ 9. In response, Defendant stated that the agreements "were signed electronically," but did not provide supporting evidence. *Christopherson Decl.*, ¶ 10.

On November 18, 2025, Plaintiff's counsel requested proof of the electronic signatures, and Defendant provided a 21-page report detailing documents Plaintiff allegedly signed. *Christopherson Decl.*, ¶¶ 11–12; *See* ECF No. 6-2, *Wynn Decl.*, Exh. B. Over the next several days, Plaintiff's counsel conducted a thorough review of the Agreements, noting they contained materially different substantive terms, including the novel "MAD Procedures" in the 2025 Agreement. *Christopherson Decl.*, ¶ 13.

On November 21, 2025, Plaintiff's counsel internally discussed the Agreements, and then emailed Defendant's counsel on November 24, 2025, identifying the issues with each, indicating Plaintiff was leaning toward opposing the Motion, offering mediation, and requesting targeted discovery if Defendant did not wish to mediate. *Christopherson Decl.*, ¶ 14. Despite this ongoing and open-ended communication, Defendant filed its Motion on

November 24, 2025 at 8:32 p.m., without confirming Plaintiff's position. *Christopherson Decl.*, ¶ 15. As of the filing of this Opposition, Defendant has not responded to Plaintiff's counsel's November 24, 2025 email. *Christopherson Decl.*, ¶ 21.

At no point did the Parties or their counsel confer in person or by telephone regarding the Agreements or any other issues in this case. *Christopherson Decl.*, ¶ 20. As a result, whether Plaintiff intended to stipulate or oppose the Agreements was left unresolved, and Defendant's representation in its Motion that "Plaintiff refused to stipulate to arbitration" is demonstrably false. *See* Motion, p.1:7-8. Plaintiff's counsel clearly communicated that she was still reviewing the Agreements and accompanying 21-page report, and that Plaintiff intended to pursue targeted discovery before formally opposing compelled arbitration, including regarding the circumstances under which the Agreements were signed and presented to employees. *Christopherson Decl.*, ¶ 14.

Plaintiff also only became aware of the case's removal to federal court upon receiving notice of Defendant's Motion on November 24, 2025. *Christopherson Decl., ¶¶ 15–16, 20.* Other than the Motion itself, Plaintiff's counsel has not received a single PACER notification, email, or mail service of any documents filed in this case, contrary to Defendant's representations in its proofs of service. *Christopherson Decl., ¶ 19.* Defendant's conduct has intentionally left Plaintiff and her counsel in the dark, prejudicing Plaintiff and unnecessarily burdening this Court. Defendant's hide-the-ball litigation tactics and failure to engage in good faith meet-and-confer discussions demonstrate a deliberate attempt to bypass the Standing Order and gain an unfair procedural advantage. For these reasons and per the Standing Order, Defendant's Motion should be summarily denied.

**B. <u>Defendant Has Failed To Establish Plaintiff Entered Into The Agreements By A Preponderance Of The Evidence</u>**

Defendant has failed to meet its burden to prove, by a preponderance of the evidence, Plaintiff entered into either Agreement. The standard for resolving a motion to compel arbitration mirrors that for summary judgment. *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004). Defendant therefore bears the burden to show "the existence of

an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (2017) (quoting *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (2014)). Where a party disputes the very formation of the agreement, the Court must give the non-moving party "the benefit of all reasonable doubts and inferences that may arise." *Wang v. Life Ins. Co. of the Southwest*, 2019 WL 13201949, at *3 (N.D. Cal. Dec. 19, 2019). Only when no genuine dispute of material fact exists may a court decide formation as a matter of law. *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (1991).

Here, numerous genuine disputes of material fact preclude the finding that Plaintiff entered into either Agreement. Most fundamentally, Defendant cannot authenticate either Agreement because Plaintiff was not the only person who accessed her Workday account or checked the "signature acknowledgment" boxes associated with its electronic records. See *Plaintiff Decl.*, ¶ 7.

When a party denies signing an agreement or raises doubts as to authenticity, the burden shifts back to the proponent of the document to authenticate it. *Isabel Garcia v. Stoneledge Furniture LLC*, 102 Cal. App. 5th 41, 51 (2024). Plaintiff unequivocally attests that she does not recall signing either arbitration agreement, and critically, that her lack of recollection is attributable to the fact that Defendant's managers routinely accessed her Workday account and completed documents on her behalf. *Plaintiff Decl.*, ¶¶ 6–7, 9. This directly contradicts Defendant's unsupported claim that only Plaintiff had access to her account. *See* Motion at 9:23–26.

Defendant cites *Ruiz v. Moss Bros. Auto Group, Inc.*, 232 Cal. App. 4th 836, 846 (2014) for the proposition that authenticating electronically signed documents is "not a difficult evidentiary burden." But *Ruiz* actually undermines Defendant's position. There, the employer failed to authenticate the electronic signature because it could not establish that the electronic act was "the act of the person," as required by Civil Code § 1633.9(a). *Id.* That is precisely the problem here. The "context and surrounding circumstances" demonstrate that multiple managers—including Alondra and Edwin—had the ability and practice of logging into

Plaintiff's Workday account and checking signature boxes for her. *Plaintiff Decl.*, ¶¶ 6–7, 9. Under these circumstances, Defendant cannot establish that any electronic acknowledgment was "the act of" Plaintiff. Civ. Code § 1633.9(a). Plaintiff also attests that it was a common practice for managers to complete or assist employees with completing documents, which she witnessed happen. *Plaintiff Decl.*, ¶ 8. This company-wide practice makes it even more improbable that the electronic acknowledgments associated with the Agreements at issue reflect Plaintiff's voluntary assent to waive her right to a judicial forum.

Defendant's own evidence does not eliminate these disputes. At most, Defendant shows that Plaintiff created a username and PIN. But the creation of login credentials does not establish who actually executed any particular electronic acknowledgment—particularly where, as here, Plaintiff presents evidence that supervisors obtained access to her Workday account to complete documents for her. When the evidentiary record supports multiple plausible inferences as to who actually clicked the relevant checkbox, Defendant necessarily fails to prove assent by a preponderance of the evidence. Because Defendant cannot authenticate the Agreements or otherwise demonstrate Plaintiff agreed to their terms, the Motion should be denied.

### C. <u>The Agreements Are Procedurally And Substantively Unconscionable</u>

If the Court finds Plaintiff executed the Agreements, it should nevertheless find the Agreements are unconscionable. As Defendant's Motion suggests, arbitration agreements governed by either the CAA or FAA are not immune from scrutiny. *See*, *e.g.*, *Cronus Investments, Inc. v. Concierge Services*, 35 Cal.4th 376, 384 (2005) ["the FAA's purpose is not to provide special status for arbitration agreements, but only to make arbitration agreements as enforceable as other contracts, but not more so."]. Indeed, the U.S. Supreme Court "permits invalidation of arbitration clauses on grounds applicable to 'any contract.'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650 (2022) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339-340 (2011)). "Liberal" enforceability does not extend to fraudulent or unconscionable arbitration agreements. *Viking River*, 596 U.S. at 650.

Here, the Agreements are both procedurally and substantively unconscionable. Under

*Armendariz v. Foundation Health Psychcare Servs., Inc.* 24 Cal.4th 83, 114 (2020), a finding that the alleged agreement is unconscionable requires "both a procedural and a substantive element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, [and] the latter on 'overly harsh' or 'one-sided' results." *Id.* at 99, citations omitted. While both "prongs" of the unconscionability test must be present, the Court has made clear that "they need not be present to the same degree" but instead are considered on a "sliding scale" in relation to one another. *Davis v. Kozak*, 53 Cal.App.5th 897, 905 (2020). In other words, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal.App.4th 816, 821 (2010) (citation omitted).

**1. The Agreements are Procedurally Unconscionable**

Procedural unconscionability concerns how the contract was formed and arises from "oppression" or "surprise" stemming from unequal bargaining power and the absence of meaningful choice. *Malone v. Superior Court (California Bank & Trust)*, 226 Cal.App.4th 1551, 1561 (2014). "Surprise" refers to terms hidden within lengthy documents drafted by the party seeking enforcement. *Baxter v. Genworth North America Corp.*, 16 Cal.App.5th 713, 723 (2017). Procedural unconscionability exists on a spectrum, with contracts freely negotiated at one end and contracts of adhesion containing surprise or other deceptive practices at the other. *Penilla v. Westmont Corp.*, 3 Cal.App.5th 205, 214 (2016).

The Agreements exhibit nearly every hallmark of procedural unconscionability. They were mandatory as a condition of employment, offered to a low-wage worker on a take-it-or-leave-it basis, and presented with no opportunity for negotiation. Even assuming Plaintiff herself signed them—which she disputes—the circumstances under which they were allegedly executed demonstrate severe oppression. Plaintiff was instructed to sign the documents during her shift, consistent with Defendant's routine practice, while working in a fast-paced environment serving customers. She had no meaningful chance to review the Agreements. Plaintiff recalls being told she "had to sign" the documents, which she

reasonably interpreted as meaning she had to do so immediately or otherwise risk losing her job. *Plaintiff Decl.*, ¶ 9. That pressure alone establishes significant procedural unfairness.

The documentary evidence further reinforces that conclusion. Defendant's Workday records for Plaintiff show when she purportedly acknowledged the 2024 and 2025 Agreements through a box-checking process that Plaintiff confirms took only minutes. *Wynn Decl.*, ¶ 8, Exh. B; *Plaintiff Decl.*, ¶ 9. More tellingly, the report shows that on July 27, 2024, Plaintiff allegedly signed 32 separate documents, including the 2024 Agreement, between 6:34:57 p.m. and 6:40:44 p.m., a span of **5 minutes and 47 seconds**. *Wynn Decl.*, ¶ 8, Exh. B. It is impossible for any employee, let alone one actively working, to meaningfully review a standalone arbitration agreement plus 31 additional documents in under six minutes. This is classic "surprise," evidencing that the agreement was buried among an avalanche of paperwork that Plaintiff was pressured to rush through without disclosure or explanation. The circumstances strongly indicate deliberate coercion. Plaintiff and other employees were routinely instructed to complete documents during their shifts while simultaneously handling customer duties, and managers sometimes completed documents on their behalf. Although Defendant will likely claim that its process was implemented for employees' benefit, the Court should not be misled by this purported act of good faith. The process was deliberately oversimplified, ensuring that neither Plaintiff nor other employees had any meaningful opportunity to review or comprehend the agreements and documents that Defendant now asserts are binding. The fact that managers could and routinely did sign documents for Plaintiff and employees reinforced the perception that these forms were unimportant and did not require Plaintiff's attention. Further, Plaintiff does not recall having to open any document before clicking "agree." *Plaintiff Decl.*, ¶ 9. Defendant knew or should have known that this process deprived employees of the ability to understand or negotiate the Agreements. Plaintiff attests that, had she understood arbitration or the consequences of the agreements, she would not have signed them. *Plaintiff Decl.*, ¶ 12.

Moreover, the same concerns apply to the 2025 Agreement, purportedly signed on February 19, 2025. On that date, Plaintiff allegedly executed nine separate documents. The

signature timestamps show that all nine were signed between 9:23:36 p.m. and 9:24:18 p.m., **a span of just 42 seconds**. *Wynn Decl.*, ¶ 8, Exh. B. The impossibility of a working employee meaningfully reviewing a standalone arbitration agreement, much less eight additional documents, in under a minute cannot be understated. These circumstances underscore the lack of meaningful choice and the rushed, coercive process under which the Agreements were presented, reinforcing the procedural unconscionability discussed above.

Such circumstances represent the hallmarks of the most serious procedural unconscionability, which, when combined even with minimal substantive unconscionability, render both Agreements wholly unenforceable.

**2. The Agreements are Substantively Unconscionable**

"Substantive unconscionability" refers to terms that unreasonably favor one party. *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1145 (2013). Though California courts have used different formulations for its standard (*e.g.*, "overly harsh," "unduly oppressive," so one-sided as to "shock the conscience," etc.), all are essentially the same: they are concerned not with a "simple old-fashioned bad bargain" but with terms that are "unreasonably favorable to the most powerful party." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899, 911 (2015). In light of the high degree of procedural unconscionability present here, even a slight showing of substantive unconscionability favors invalidation. *See, e.g.*, *Baxter*, 16 Cal.App.5th at 721.

*a) The Arbitration Initiation Procedures Impose One-Sided Barriers to Accessing Arbitration*

Both Agreements impose rigid initiation rules, but the 2025 version adds several new requirements that further impede employees from accessing arbitration. These include a mandatory 30-day "Cooling Off Period," followed by another 30-day delay if an "Informal Settlement Conference" is requested. During these periods, arbitration demands cannot be filed or administered. These delays operate only to the employer's benefit and deprive Plaintiff of timely enforcement of her statutory rights. Under *Sanchez*, such "overly harsh" and "unduly oppressive" terms qualify as substantively unconscionable because they advantage

only the more powerful party. The effect is also nonmutual: employers rarely initiate arbitration, so the burdens fall solely on employees. *Armendariz*, 24 Cal.4th 83, 118 (2000).

*b) The 2025 Agreement's MAD Procedures Create Significant Delay, Impede Filing, and Unreasonably Favor Defendant*

The "Mass Arbitration Demand[] Procedures" or "MAD Procedures" in the 2025 Agreement impose significant, one-sided burdens that prevent Plaintiff from obtaining timely and individual adjudication of her claims.

First, the MAD Procedures freeze all but ten claims whenever ten or more similar demands are submitted. Only ten cases may move forward, and the remaining employees are barred from even filing or having their claims administered. Defendant suggests that the initial batch is "encouraged" to be resolved within 120 days, but that timeline is aspirational, not required. It is not uncommon for arbitrations involving just a single claimant to take a year or more to resolve. A batch of up to ten cases—each with separate claims, witnesses, and damages—would almost certainly take longer. For claimants outside the initial batch, the delay is even more extreme because they cannot initiate arbitration until the first consolidated matter resolves, or they are otherwise forced into mediation before they can initiate arbitration. Such delays frustrate Plaintiff's ability to have her claims adjudicated, while unreasonably favoring Defendant. Delaying or obstructing access to the forum in this manner is precisely the type of one-sidedness *Sanchez* identifies as substantively unconscionable. *Sanchez*, 61 Cal.4th at 911.

Second, the batching requirement deprives employees, including Plaintiff, of the individual adjudication that Defendant claims the 2025 Agreement necessarily mandates. By forcing her claim to be decided alongside up to nine others, the agreement alters the nature of the proceeding and injects other claimants' facts, theories, and damages into the adjudicative process. This clearly prejudices Plaintiff.

Third, after completion of the first batch, the 2025 Agreement requires all remaining claimants to participate in a mandatory global mediation before any additional arbitration claims may be filed. This imposes collective, class-like procedures on claimants while

simultaneously requiring them to waive class and collective claims for Defendant's benefit. Defendant therefore seeks the advantages of class-wide resolution while prohibiting Plaintiff and employees from pursuing class relief.

Fourth, the MAD Procedures are nonmutual in effect. Only employees are burdened by the freezing, batching, and mandatory mediation requirements. This lack of mutuality is a hallmark of substantive unconscionability under *Armendariz*, 24 Cal.4th at 118.

Taken together, the MAD Procedures create unreasonable delay, impose collective processes without consent, and materially alter Plaintiff's ability to pursue her claims individually. These provisions are highly substantively unconscionable on their own.

*c) The Discovery Limitations in the 2024 and 2025 Agreements are Substantively Unconscionable*

Both the 2024 and 2025 Agreements impose discovery limits that fall short of California law requirements for employees asserting statutory claims. Employees "are entitled to sufficient discovery as a means of vindicating their . . . claims." *Armendariz*, 24 Cal.4th at 106. Under *Ramirez v. Charter Communications, Inc.*, 16 Cal.5th 478, 504 (2024), the assessment of whether a discovery clause is unconscionable turns on several general factors: the types of claims covered, the amount of discovery allowed, the extent to which that discovery differs from what would be available in litigation, any asymmetry between the parties, and the arbitrator's authority to order additional discovery. Both agreements cover the full range of employment and wage-and-hour claims, yet the 2025 version sharply limits discovery to only three depositions and five interrogatories—far less than what would be available under the California Code of Civil Procedure—and provides no meaningful assurance that the arbitrator will broaden those limits. Given the employer's control over most relevant documents, witnesses, and internal systems, the asymmetry is especially exaggerated. The 2024 Agreement, while broader than the 2025 version, still binds the Parties to arbitration-specific limits that meaningfully constrain Plaintiff's ability to develop necessary evidence. Specifically, the 2024 Agreement limits discovery by requiring that any additional discovery be approved solely by the arbitrator, foreclosing the Parties' ability to

stipulate to further discovery if needed. This is unduly restrictive.

The 2025 Agreement's MAD Procedures further magnify these deficiencies. If Plaintiff's claim is batched with others, it is unclear whether she would receive her own discovery allotment or whether the batch must share the same limited number of depositions and written discovery opportunities. Either scenario reduces the discovery available to her compared to an individual litigation setting, and in practice would dilute or delay discovery in a way that materially impairs her ability to prove her claims. Batched proceedings also create logistical and case-management pressures that make it less likely an arbitrator will expand discovery for any individual claimant. When viewed through the factors identified in *Ramirez*, the discovery constraints in both agreements, especially in the 2025 version, are unreasonably restrictive, significantly depart from what would be available in court, and operate to the Plaintiff's detriment and Defendant's advantage. They are, therefore, substantively unconscionable.

*d) The Choice-of-Law Framework in the 2025 Arbitration Agreement Unreasonably Favors Defendant*

The choice-of-law structure in the 2025 Agreement is also substantively unconscionable. Although each Agreement summarily states it is governed by the FAA, the 2025 Agreement goes further by adding a fallback to the Texas Arbitration Act ("TAA") if the FAA does not apply, rather than defaulting to the CAA, even though the employment relationship between Plaintiff and Defendant arose entirely in California, and Plaintiff has no connection whatsoever to Texas. Defendant appears to justify this provision in the 2025 Agreement by asserting that it is "based in Texas," but Defendant simultaneously operates at least 129 locations throughout California, according to its own publicly available store directory (available at https://locations.raisingcanes.com/ca). These include locations spanning the entire State of California. Thus, the notion that California law should be displaced in favor of the TAA under these circumstances is egregiously one-sided and benefits only Defendant. *See Lucas v. Gund, Inc.*, 450 F.Supp.2d 1125, 1134 (2006) (holding that a forum-selection term requiring arbitration in New Jersey (rather than California) was

substantively unconscionable because it imposed an undue burden on the California employee, and further conflicted with 9 U.S.C. § 4, which requires arbitration to occur "*within the district* in which the petition for an order directing such arbitration is filed" (emphasis added)).

*e) The Agreements Contain No Provision for Judicial Review of the Arbitrator's Decision*

Though the Agreements state that the arbitrator "will issue a decision or award in writing, stating the essential findings of fact and conclusions of law," and that "a court of competent jurisdiction shall have the authority to enter judgment upon the arbitrator's decision/award," this language does not provide Plaintiff any right to judicial review, thereby limiting Plaintiff's legal remedies. The reference to a court's authority to "enter judgment" is purely ministerial and does not recognize any avenue for meaningful appellate review. Multiple courts have articulated the importance of judicial review of arbitrator findings. *See e.g.*, *Armendariz*, 24 Cal.4th at 106–07 (holding "in order for such judicial review to be successfully accomplished, an arbitrator . . . must issue a written arbitration decision that will reveal, however briefly, the essential findings and conclusions on which the award is based"); *see Moncharsh v. Heily & Blase*, 3 Cal.4th 1, 32 (1992) (finding judicial review appropriate when "granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights").

Under California's sliding-scale framework, the severe procedural defects present here require only a minimal showing of substantive unconscionability to render an agreement unenforceable. Because both agreements contain multiple substantively unconscionable terms, they cannot be enforced.

**D. <u>The MAD Procedures In The 2025 Agreement Undermine The Class Action/Collective Action Waiver And Preclude Its Enforcement</u>**

Defendant drafted the MAD Procedures in the 2025 Agreement in a way that creates a class-like aggregation mechanism that operates only when it benefits Defendant—namely, when it reduces Defendant's arbitration fee exposure and administrative burden. Rather than

expressly addressing whether these procedures constitute consent to class or collective arbitration under *Lamps Plus, Inc. v. Varela*, 587 U.S. 176 (2019), Defendant has strategically designed this provision so that it may invoke aggregated, batched, and class-like arbitration and mediation procedures for its own advantage while simultaneously insisting that Plaintiff waive any ability to pursue class or collective relief against it. This drafting choice is clearly designed to secure the benefits of a *de facto* class arbitration whilst limiting its exposure to a court construing the language in this provision as assenting to a true class arbitration under *Lamps Plus*.

This deliberate asymmetry and manufactured ambiguity undermine the enforceability of the Class Action/Collective Action Waiver due to the irreconcilable tension between the waiver and the MAD Procedures. Alternatively, if the Court determines the MAD Procedures are enforceable and require mandatory aggregation and class-like arbitration, those same procedures provide the unambiguous contractual basis necessary under *Lamps Plus* to conclude that Defendant has agreed to resolve claims on an aggregated or class-wide basis. *Id.* at 188. In that event, the Court should compel both Plaintiff's individual and class claims in this case to class arbitration.

### E. <u>The Court, Not The Arbitrator, Must Consider The Question Of Arbitrability</u>

Delegation clauses are treated as severable "mini agreements" within an arbitration agreement, and a court must determine whether that delegation itself is enforceable before sending any arbitrability questions to an arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010). A party may challenge a delegation clause by showing how surrounding or "unrelated" provisions render the delegation unconscionable. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (2023). At the same time, the "clear and unmistakable" standard governs who decides arbitrability in the first place: absent clear and unmistakable evidence that the parties agreed to delegate arbitrability, it is presumed that the court decides that question. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995); Rent-A-Center, 561 U.S. at 69 n.1. That standard concerns manifestation of intent, not validity, and

in "circumstances where contracting parties would likely have expected a court to have decided the gateway matter," courts assume that is what they agreed to. *Rent-A-Center*, 561 U.S. at n.1.

First, Plaintiff's threshold challenge is that no arbitration agreement was validly formed with respect to either the 2024 or 2025 Agreements. A delegation clause that speaks only to "interpretation, applicability, enforceability, or waiver of this Agreement" cannot itself answer the logically preceding question of whether any agreement exists to begin with. Where the very existence of an agreement is disputed, there can be no "clear and unmistakable" manifestation of intent to delegate arbitrability to an arbitrator, because that manifestation itself depends on the formation of a contract. Under *Rent-A-Center* and *First Options*, that gateway formation question must be resolved by the Court, not an arbitrator*. Id.*; *First Options of Chicago, Inc.*, 514 U.S. at 944–45.

Second, even assuming *arguendo* that a delegation clause exists, its enforceability is for the Court to decide because Plaintiff's unconscionability challenge is anchored in provisions that the Parties expressly reserved for judicial review. Defendant quotes only the first sentence of the 2025 Agreement's delegation clause ("the arbitrator… shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or waiver of this Agreement"), but conveniently omits the carve-outs providing that disputes concerning the Class Action/Collective Action Waiver, the California PAGA Individual Action Requirement, and, in the 2025 Agreement, the MAD Procedures, are to be decided "only by a court of competent jurisdiction and not by an arbitrator." Those provisions are at the core of Plaintiff's unconscionability arguments and, under *Holley-Gallegly*, may be relied upon to show that the delegation itself is unenforceable. *Holley-Gallegly*, 74 F.4th at 1002. Because Plaintiff contends that these carved-out provisions render both the 2024 and 2025 Agreements unconscionable as a whole (with the exception of any PAGA individual requirement), the Court must evaluate the enforceability of the delegation clause and these agreements in their entirety, rather than sending these issues to an arbitrator.

### F. The Agreements Cannot Be Salvaged Through Severance

Defendant contends that the Court may simply sever any unconscionable terms from the 2025 Agreement and enforce the remainder, while altogether ignoring the enforceability of the severability clauses in the 2024 Agreement. However, "an arbitration agreement permeated by unconscionability, or one that contains unconscionable aspects that cannot be cured by severance, restriction, or duly authorized reformation, should not be enforced." *Armendariz*, 24 Cal.4th at 126. When "multiple defects" appear in an arbitration agreement, a court may properly refuse severance and decline enforcement entirely, because such agreement reflects "a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." *Id.* at 127. Severance is also inappropriate where the "taint of illegality cannot be removed" without the court having to rewrite the agreement by supplying additional terms. *Fitz v. NCR Corp.*, 118 Cal.App.4th 702, 715–17, 727 (2004).

Here, the pervasive substantive and procedural unconscionability identified throughout both Agreements cannot be remedied through severance. Removing the unlawful provisions would gut core structural components, including key initiation rules, discovery restrictions, the MAD Procedures, the one-sided choice-of-law clause, the class action waiver provision, and the delegation provision, leaving no coherent arbitration agreement behind. The Court would have to engage in wholesale reconstruction, which *Armendariz* and *Fitz* squarely preclude. For these reasons, neither agreement can be salvaged through severance.

The interests of justice, which *Armendariz*, 24 Cal.4th at 124, identifies as the "overarching" consideration in any severability analysis, also confirm that severance is inappropriate here. The first policy basis for severance, preserving the contractual relationship, is inapplicable because the employment relationship has already ended. *Abramson v. Juniper Networks, Inc.*, 115 Cal.App.4th 638, 667 (2004) ("[N]ow that the parties' employment relationship has ended … there obviously is no contractual relationship to preserve."); *Fitz*, 118 Cal.App.4th at 727. The second policy basis, to prevent undeserved benefit or detriment, also does not apply because severing the unlawful provisions would

confer an undeserved benefit on Defendant, by leaving in place Agreements that remain unconscionable in structure and effect. Accordingly, the Court should decline to enforce either Agreement in its entirety.

**G. Defendant's Contemporaneous Request To Stay This Matter Is Improper And Premature**

Defendant's request to stay this action is both legally improper and premature. If the Court ultimately grants Defendant's motion to compel Plaintiff's claims to arbitration, whether under the 2024 or 2025 Agreement, a stay would not be appropriate under recent Ninth Circuit authority, *Faulk v. JELD-WEN, Inc.*, 2025 WL 3183012 (9th Cir. Nov. 14, 2025).

*Faulk* applies the Supreme Court's decision in *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 30 (2025), which held that a case removed based on federal question and supplemental jurisdiction should be remanded following a subsequent amendment that removes any federal question. *Royal Canin* overruled prior Ninth Circuit authority that post-removal amendments could not defeat jurisdiction. Consistent with this directive, *Faulk* held that removal under the Class Action Fairness Act ("CAFA") is defeated when class allegations are excised after removal because minimal diversity no longer exists. *Faulk*, 2025 WL 3183012 at *5. The absence of CAFA jurisdiction required remand to state court. *Id.*

Here, Defendant removed this case solely under CAFA based on minimal diversity. *See generally* ECF No. 1, Defendant's Notice of Removal. However, if Defendant succeeds on its Motion, the Class Action/Collective Action Waiver would necessarily be enforced, thereby eliminating Plaintiff's ability to maintain class allegations. Under *Royal Canin* and *Faulk*, the elimination of class claims would divest this Court of original subject-matter jurisdiction. Defendant could no longer rely on CAFA's minimal-diversity provision, and remand to the San Joaquin County Superior Court would be required.

Because Plaintiff intends to move for remand on this basis if the Court ultimately compels arbitration of Plaintiff's claims, any ruling on Defendant's request for a stay is premature and improper. The propriety of a stay cannot be assessed until the threshold

jurisdictional consequences under *Royal Canin* and *Faulk* are resolved.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion.

Respectfully submitted,

Dated: December 8, 2025

**MOON LAW GROUP, PC**

By: *<u>/s/ Nichelle Christopherson</u>*
Kane Moon
Jacquelyne VanEmmerik
Nichelle Christopherson
*Attorneys for Plaintiff, Elizabeth Xatruch*