UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH XATRUCH,<br>Plaintiff,<br>v.<br>RAISING CANES U.S.A., LLC<br>Defendants. | No. 2:25-cv-03341-DJC-SCR<br><br>ORDER |

Pending before the Court is Defendant's Motion to Compel Arbitration. Plaintiff filed a class action complaint alleging several wage-and-hour claims under the California Labor Code and alleging a violation of the California Unfair Competition Law. Plaintiff argues the Motion should be denied because Defendant cannot show that she executed either agreement, and even if an agreement existed, it is procedurally and substantively unconscionable. Plaintiff also challenges the Mass Arbitration Demand Procedures ("MAD Procedures") present in the most recent agreement. For the reasons outlined below, the Court will GRANT Defendant's Motion to Compel Arbitration but severs the MAD Procedures.

////

////

## BACKGROUND

Plaintiff Elizabeth Xatruch was an employee for Defendant Raising Canes, U.S.A., LLC, from July 27, 2024, to July 1, 2025. (Compl. (ECF No. 1-2, Ex. B) ¶ 7; Wynn Decl. (ECF No. 6-2) ¶ 3.) Defendant is alleged to have business entities in numerous counties through California, including a location in San Joaquin County. (Compl. ¶ 9(a).) Plaintiff brings this wage and hour action for herself and on behalf of a proposed class of similarly situated parties. (*Id.* ¶ 2.)

Plaintiff and Defendant allegedly entered into two arbitration agreements: a Mutual Agreement to Arbitrate Claims ("2025 Agreement") on February 19, 2025 (2025 Agreement (ECF No. 6-2, Ex. C)), and a Mutual Agreement to Arbitrate Claims on July 27, 2024 ("2024 Agreement"). (Mot. Compel Arbitration ("Mot.") (ECF No. 6) at 2–3.)

On October 10, 2025, Plaintiff filed her suit in the San Joaquin Superior Court. Defendant then removed the action to this Court. (Not. Removal (ECF No. 1) at 3–5) and filed the instant motion to compel arbitration. The matter is fully briefed (Opp'n (ECF No. 8); Reply (ECF No. 10)) and was ordered submitted following oral argument (ECF No. 11).

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs arbitration agreements. 9 U.S.C. § 2. The FAA affords parties the right to obtain an order directing that arbitration proceeds in the manner provided for in the agreement. *Id.* § 4. Under the FAA, federal courts must apply state-law principles that govern the formation of contracts when determining whether the specific dispute between the parties is one that they agreed to arbitrate. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). To decide on a motion to compel arbitration, a court must determine: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016).

Arbitration is a contract matter, and the FAA requires courts to honor parties' expectations. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67–69 (2010)). However, parties may use general contract defenses to invalidate an agreement to arbitrate. *See id.* at 339. Thus, a court should order arbitration of a dispute only where satisfied that neither the agreement's formation nor its enforceability or applicability to the dispute is at issue. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–300 (2010). "Where a party contests either or both matters, the court must resolve the disagreement." *Id.* at 299–300 (internal quotation omitted). If a valid arbitration agreement encompassing the dispute exists, arbitration is mandatory. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Under section 3 of the FAA, a court, "upon being satisfied that the issue involved. . .is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of a valid agreement to arbitrate. *See Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). In resolving a motion to compel arbitration, the "summary judgment standard [of Federal Rule of Civil Procedure 56] is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quotation omitted). Under this standard, the "party opposing arbitration receives the benefit of any reasonable doubts and the court draws reasonable inferences in that party's favor, and only when no genuine disputes of material fact surround the arbitration agreement's existence and applicability may the court compel arbitration." *Smith v. H.F.D. No. 55, Inc.*, No. 2:15-cv-01293-KJM-KJN, 2016 WL 881134, at *4 (E.D. Cal. Mar. 8, 2016).

## DISCUSSION

Defendant argues that arbitration is proper in this matter because (1) Plaintiff assented to the 2025 Agreement (2) the 2025 Agreement covers each of Plaintiff's claims and (3) the delegation clause requires that any disputes related to the interpretation, applicability or enforceability of the 2025 Agreement must, itself, be arbitrated. Plaintiff disputes the propriety of arbitration on the grounds that (1) Defendant has not met its burden in showing that Plaintiff executed the Agreements, and (2) that even if an agreement was formed, it is unconscionable such that it cannot be enforced. Plaintiff's first objection is rooted in the formation, and the second relates to the question of unconscionability. The Court will take each argument in turn.

### I. Formation of the Arbitration Agreement

Whether an agreement to arbitrate exists is a non-delegable issue that must be decided in district court. *Granite Rock Co.,* 561 U.S. at 297 (explaining that issues reserved to the courts for decision "always include" whether an arbitration agreement was formed); *see Ahlstrom v. DHI Mortg. Co., Ltd.,* 21 F.4th 631, 635 (9th Cir. 2021) ("[P]arties cannot delegate issues of formation to the arbitrator."). The party seeking to enforce an arbitration agreement bears the burden of proving by a preponderance of the evidence that a contract to arbitrate was formed. *Wilson v. Huuuge, Inc.,* 944 F.3d 1212, 1219 (9th Cir. 2019). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 855 (9th Cir. 2022). In California, a contract is formed if the (1) partes are capable of contracting; (2) they consent; (3) there is a lawful object; and (4) there is sufficient cause of consideration. Cal. Civ. Code § 1550. A party's consent to "an agreement to arbitrate may be express, as where a party signs the agreement" or "implied in fact." *Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US) LLC,* 55 Cal. 4th 223, 236 (2012).

*////*

The issue of formation centers on whether Defendant has met its burden in showing that Plaintiff entered into the 2025 Agreement. In California, an electronic signature has the same effect as a legal handwritten signature. Cal. Civ. Code § 1633.7. Its authenticity "may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." *Id.* § 1633.9. "For example, a party may present evidence that the signatory was required to use a unique, private login and password to affix the electronic signature, along with evidence detailing the procedures the person had to follow to electronically sign the document and the accompanying security precautions. *Garcia v. Stonelodge Furniture, LLC,* 102 Cal. App. 5th 41, 53 (2024).

Here, Defendant submitted a declaration from Ashley Wynn, the Director of Crew Systems and Reporting for Defendant. (*See generally* Wynn Decl.) She explains that when a new "crewmember" is hired, and again from time to time during their employment, Defendant presents policies and other documents, including arbitration agreements, to review through an online platform called Workday. (*Id.* ¶ 4.) When a new policy or document is distributed, crewmembers receive a personal message in their inbox on Workday as a task to be completed. (*Id.* ¶ 5.) Each crewmember is given their own unique username and password. (*Id.* ¶ 4.) Crewmembers can access Workday from company devices or from their personal device via the Workday mobile app. (*Id.*) Crewmembers may set up a unique PIN to use in place of their password when logging into Workday. (*Id.*) After logging in, crewmembers can access their inbox and complete their tasks. (*Id.*)

On January 29, 2025, Defendant implemented the 2025 Agreement, which was distributed to crewmembers for electronic review through Workday, and was accessible as a task in the Workday inboxes. (*Id.* ¶ 6 (citing (ECF No. 6-2, Ex. A)).) Opening the task presented crewmembers with a separate link to open and review each document in the task, including the 2025 Agreement. (*Id.*) Below the link to the

2025 Arbitration Agreement, is the word "instructions," followed by the content of the instructions for the agreement, which stated, "[p]lease review the Mutual Agreement to Arbitrate claims and acknowledge as appropriate." (*Id.*) Below the instructions was the phrase "Signature Statement," with the following statement:

> I understand that checking the "I Agree" box below is equivalent to my electronic signature and that doing so is the same as if I had signed the Mutual Agreement to Arbitrate Claims in ink. I further understand that by checking the box below, I am agreeing to and will be required to arbitrate any and all claims against the Company, as permitted by law.

(*Id.*)

Under the signature statement were the words "I Agree" followed by a clickable check-box to indicate one's agreement to be bound by the Mutual Agreement to Arbitrate Claims. (*Id.*) Further below that was a blue, electronic "submit" button. (*Id.*) Upon reviewing the 2025 Agreement, crewmembers could complete and close the task by clicking the "submit" button. (*Id.*)

Wynn further attests that Plaintiff's employment personnel records include a report listing each document that she has electronically acknowledged/signed during her employment with Defendant. (*Id.* ¶ 8; (ECF No. 6-2, Ex. B).) This report shows that on February 19, 2025, at 9:24 p.m. Plaintiff electronically acknowledged/signed the 2025 Agreement. (*Id.*) Further, Wynn attests to reviewing Plaintiff's Workday logins, which show that her account was accessed on February 19, 2025, via the Workday mobile app, using her username and a password input via her unique mobile PIN. (*Id.* ¶ 9.)

Plaintiff argues that Defendant cannot authenticate the 2025 Agreement because Plaintiff was not the only person who accessed her Workday account or checked the "signature acknowledgment" boxes associated with its electronic records. Plaintiff includes a declaration attesting that she does not recall signing,

reviewing, or being given a copy of any arbitration agreement at any point during her employment. (Xatruch Decl. (ECF No. 8-1) ¶ 4.) She also states that any signature that may exist was done fraudulently or through undue coercion. (*Id.* ¶ 5.) Plaintiff discusses one occasion where she remembers signing documents on Workday and was unclear about what those documents were but was told she "had to" sign them. (*Id.* ¶ 9.) Plaintiff also recounts multiple occasions during her employment where managers asked her to sign documents toward the middle or end of her shift while she was working or preparing to leave. (*Id.* ¶ 6.) Further, she recalls an instance in 2024, when one of Defendant's managers told Plaintiff that Plaintiff needed to sign some documents. (*Id.* ¶ 7.) Since Plaintiff was about to leave for the day, the manager told Plaintiff to log into the application on one of the Defendant's tablets because the manager would "take care of it" for her. (*Id.*) Plaintiff understood this to mean that the manager would complete or sign the documents for Plaintiff. (*Id.*) Additionally, Plaintiff discusses the "practice" of managers completing or assisting employees with completing documents. (*Id.* ¶ 8.)

The Court does not find that Plaintiff has demonstrated a genuine dispute of material fact with respect to her assenting to the 2025 Agreement. Although Plaintiff represents that there were incidents where her managers had access to the Workday account, the most recent date that such an incident occurred was in 2024. Here, the Wynn Declaration and the accompanying exhibits show that the 2025 Agreement was accepted from Plaintiff's Workday account in February 2025. Moreover, the evidence presented demonstrates that the 2025 Agreement was accepted from the Workday mobile app, rather than from a company owned tablet or device.

////

////

////

////

////

As such, the Court finds no genuine issue of material fact as to whether Plaintiff accepted the 2025 Agreement.[1] Accordingly, a valid agreement to arbitrate was formed.

## II. Delegation Clause

Next, Plaintiff contends that any agreement to arbitrate is unconscionable and thus unenforceable. Defendant argues that because there is a delegation clause, any issues relating to enforceability, including Plaintiff's unconscionability argument, are to be decided by an arbitrator.

A delegation clause is a clause within an arbitration provision that delegates to the arbitrator "gateway" questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all. *Rent-A-Ctr.,* 561 U.S. at 68–69. The presence of a delegation clause limits the issues that a court may decide in the context of contracts governed by the FAA. *Caremark, LLC v. Chickasaw Nation,* 43 F.4th 1021, 1029 (9th Cir. 2022). The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Id.* (citation omitted). But there must be "clear and unmistakable" evidence that "the parties agreed to arbitrate arbitrability." *Id.* (citation omitted). A party opposing arbitration must "challenge[ ] the delegation provision specifically for a court to intervene." *Id.* (citation and internal quotation marks omitted).

### A. Clear and Unmistakable

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) (internal quotation marks and citation omitted). An express agreement to arbitrate arbitrability may satisfy this

---

[1] The Court need not reach a conclusion as to the 2024 Agreement, as the 2025 Agreement states that it "applies to any and all disputes, past, present or future, that arise from or relate to" an employee's "employment and/or separation of employment with Employer." (2025 Agreement at 1.)

standard. *Mohamed v. Uber Techs., Inc.,* 848 F.3d 1201, 1208 (9th Cir. 2016) (citation omitted). Here, the 2025 Agreement reads: ". . . the arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or waiver of this Agreement." (2025 Agreement at 1); *see, e.g., Mohamed*, 848 F.3d at 1209 (finding an arbitration agreement delegating "enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision" to an arbitrator "clear and unmistakeabl[e]"). It is worth also noting the 2024 Agreement includes the same language, and reads, "the arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or waiver of this Agreement." ((ECF No. 6-2, Ex. D) at 1.) Accordingly, the Court finds clear and unmistakable evidence of an agreement to arbitrate arbitrability.

**B. Unconscionability**

Next, Plaintiff argues that the delegation clause is unenforceable because the unconscionability challenge she makes is premised on provisions in the Agreement that are reserved for judicial review. Specifically, she points to the Class Action/Collective Action Waiver, the California PAGA Individual Action Requirement and the MAD Provisions. Plaintiff contends that because those provisions underlie her unconscionability arguments, they may be used to show the delegation provision is unenforceable. Defendant argues that Plaintiff's arguments apply only to the Agreement as a whole and fails to provide explain how the terms render the delegation clause unconscionable. (Reply at 7–8.)

As with any arbitration agreement, an agreement to arbitrate a "gateway" issue is valid "save upon such grounds as exist at law or in equity for the revocation of any contract." *Rent-A-Ctr.,* 561 U.S. at 68–70 (citing 9 U.S.C. § 2). To challenge the validity of the delegation clause, Plaintiff "must specifically reference the delegation provision and make arguments challenging it[.]" *Bielski v. Coinbase, Inc.,* 87 F.4th 1003, 1011

(9th Cir. 2023). A plaintiff may use the same argument to challenge the delegation clause and the arbitration agreement as a whole, but she must "articulate[ ] why the argument invalidates each specific provision." *Id.*

The Court finds that Plaintiff has not invoked a challenge of the delegation clause on unconscionability grounds. To support her argument, Plaintiff cites *Holley-Gallegly v. TA Operating, LLC,* 74 F.4th 997 (9th Cir. 2023). There, the Ninth Circuit analyzed an employee's challenge to the validity of a delegation provision and whether the district court correctly found it to be substantively unconscionable because of a jury-waiver provision. *See id.* at 1002. On this point, the court addressed two issues. First, it reinforced the principle that while a party resisting arbitration is not limited to the text of a delegation clause to argue that such clause is unconscionable, the party must explain how those outside provisions make <u>the fact of an arbitrator deciding arbitrability unconscionable</u>. *Id.* at 1002 (emphasis in original). Second, it explained that the district court nonetheless erred because the jury-waiver provision it relied on was inapplicable to the <u>delegation clause</u> and could not be relied on to show it was unenforceable. *See id.* at 1002–03. Because there was nothing showing unconscionability as to "the delegation of arbitrability to the arbitrator," the issue was to go to arbitration. *Id.* at 1003.

Here, the Court finds that although Plaintiff has pointed to provisions that may demonstrate unconscionability and has mentioned the delegation clause, she has not explained <u>how</u> those provisions impact the question of arbitrability specifically. *See Rent-A-Ctr.,* 561 U.S. at 74 (explaining that to argue that *Rent-A-Center's* delegation clause was unconscionable based on discovery procedures in the arbitration agreement, plaintiff would have "had to argue that the limitation upon the number of depositions cause[d] the arbitration of his claim that the Agreement is unenforceable to be unconscionable."); *Bielski,* 87 F.4th at 1011 (explaining that the plaintiff "specifically challenged the enforceability of the delegation provision" where he mentioned it and crafted arguments directly addressing its unconscionability);

*Heckman v. Live Nation Ent.*, 686 F. Supp. 3d 939, 952 (C.D. Cal. 2023), *aff'd* 120 F.4th 670 (9th Cir. 2024) (noting that the plaintiff made unconscionability arguments "directed at the delegation clause"). Absent any such discussion, the Court finds that Plaintiff has forfeited her ability to challenge the delegation provision's validity. *See Aguilar v. Keurig Dr. Pepper Inc.,* No. 5:25-cv-02021-SSS-DTBx, 2025 WL 3691836, at *5 (C.D. Cal. Oct. 30, 2025) (collecting cases). As such, Plaintiff must arbitrate the gateway issues and the majority of her unconscionability claims before the arbitrator.

**III. Mass Arbitration Demand Procedures**

However, the Delegation Clause permits parties to litigate the validity of the "Mass Arbitration Demand ("MAD") Procedures and Class Action/Collective Action Waiver in court. Thus, the Court turns to Plaintiff's unconscionability arguments to the extent that they fall under these explicit carveouts. *See, e.g., Carolus v. Coinbase Glob., Inc.,* No. 25-cv-03089-CRB, 2025 WL 3033736, at *7 (N.D. Cal. Oct. 7, 2025) (addressing a plaintiff's unconscionability argument related to a class action waiver where the delegation clause permitted litigating the validity of the class waiver in court). "Unconscionability has both a 'procedural' and a 'substantive' element." *Taylor v. TA Operating, LLC,* No. 2:22-cv-00947-WBS-DMC, 2023 WL 171359, at *3 (E.D. Cal. Jan. 12, 2023) (citing *Armendariz v. Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 114 (2000)), and "[b]oth [must] be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." *Id.*

The 2025 Agreement reads, in part:

> If 10 or more claimants submit Requests for Arbitration or seek to file arbitration raising similar claims and are represented by the same or coordinate counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in stages, batched proceedings. You agree to this process even though it may delay the arbitration of your claim.
>
> In the first stage, claimants' counsel and Employer will select 5 cases (10 cases total) to be filed in arbitration to be

> resolved in a single consolidated proceeding with one arbitrator who is selected according to the Arbitration Selection process in this Agreement. The mutually selected Arbitrator or AAA (if the parties do not mutually select the arbitrators under the first paragraph of the Arbitrator Selection Section above) will charge one set of filing or other applicable administrative fees for this batch of 10 cases.
>
> In the meantime, no other cases may be filed or proceed in arbitration, and the mutually selected Arbitrator or AAA (if the parties do not mutually select the arbitrators under the first paragraph of the Arbitrator Selection above) cannot assess or demand payment for fees for the remaining cases nor administer or accept them. In addition to the requirements for the Request for Arbitration specified in the Initialing Arbitration, Cooling off Period, and Informal Settlement Conference Section above, any cases subject to these MAD Procedures must also include a separate attestation from claimant's counsel, subject to Fed. R. Civ. P. 11, averring that the Request for Arbitration for each individual case is true and correct to the best of counsel's knowledge.
>
> The arbitrator for this initial batch of cases is encouraged to resolve the matter within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the initial arbitration matter is completed, the parties must engage in a single mediation (with the parties to mutually select a mediator and if not possible, the mediator to be selected under the AAA Rules) of all remaining cases to be resolved in simultaneous arbitrations of 20 claimants each by new, different arbitrators, subject to the Arbitrator Selection Process in this Agreement to the Arbitrator Selection process in this Agreement. Remaining cases will be assigned to a batch randomly.

(2025 Agreement at 4–5.)

### A. Procedural Unconscionability

The Parties first dispute whether procedural unconscionability exists here. A procedural unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 126 (2019) (citation

omitted). An adhesion contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power "on a take-it-or-leave-it basis." *Id.* (citations omitted). In such instances, courts assess whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. *Id.* (citations omitted). "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Pinnacle Museum Tower Ass'n.,* 55 Cal. 4th at 247.

Here, there is no meaningful dispute that the contract here is one of adhesion in the employment setting. Further, Plaintiff has included a declaration describing the circumstances under which she had to accept the Agreements, which involved signing the agreements during her shift and pressure from her managers. (Xatruch Decl. ¶¶ 5,9.) However, outside of the time pressures alleged by Plaintiff, it is unclear to the Court how much "surprise" exists. The Agreements were provided to her as separate, standalone documents which were "oversimplified." (Opp'n at 7.) This contrasts findings of surprise where agreements were "opaque" and "complex." *OTO*, 8 Cal. 5th at 128. Nevertheless, the circumstances here are significant enough to warrant a finding of moderate unconscionability.

**B. Substantive Unconscionability**

Plaintiff challenges several aspects of the MAD procedures as substantively unconscionable. She generally contends that the MAD Procedures deprive employees of individual adjudication, conflicts with the class action/collective action waivers, impose significant delays, and unreasonably favor Defendant. Defendant disputes that the MAD Procedures are substantively unconscionable. Substantive unconscionability exists where terms are "overly harsh," "unduly oppressive," "unreasonably favorable," or "shock the conscience." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017) (citing *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911 (2015)).

The Court notes that in recent years, mass arbitration demand procedures have become increasingly common and have had varying levels of legal success. *See Gustin v. Club Demonstration Servs., Inc.,* No. 1:25-cv-00579-JLT-FJS, 2026 WL 1948873, at *7 (E.D. Cal. July 6, 2026). One of the most notable "failures" occurred in *Heckman v. Live Entertainment International,* where the Ninth Circuit analyzed a mass arbitration protocol of a delegation clause in a ticket purchase agreement. 170 F.4th 670 (9th Cir. 2024). There, the mass arbitration rules batched cases and presented three bellwether cases to an arbitrator. *Id.* at 678. Those three bellwether cases then served as precedents for all cases in the same batch. *Id.* at 679. Individuals in non-bellwether cases had no right to participate in the bellwether cases, no access to the bellwether decision until it was invoked against them, no notice of the bellwether cases, no opportunity to be heard, and no right to opt-out of the batch. *See id.* at 684–85. In years that followed, courts have found agreements with similar bellwether procedures substantively unconscionable. *See Gustin,* 2026 WL 194887, at *8 (collecting cases).

On the other hand, courts have found certain mass arbitration provisions not to be unconscionable. Some instances include agreements with "batch arbitration provisions" where claimants are not bound by each other's outcomes. *See Kohler v. Whaleco, Inc.,* 757 F. Supp. 3d 1112, 1128–29 (finding a batch provision that was unlikely to cause any significant delays and would not bind claimants by the results of another claimant's results was not substantively unconscionable); *Davis v. Experian Info. Sols., Inc.,* No. 25-cv-04819-HSG, 2025 WL 2998157, at *5–6 (N.D. Cal. Oct. 24, 2025) (similar).

Here, although the MAD Procedures involve batch proceedings that do not have a binding effect on later or absent parties, the Court nevertheless is concerned about the delays involved with such a process. The MAD Procedures encourage a 120-day resolution, but there is no requirement that deadline is met, nor does there appear to be any opt-out provision for parties after that timeframe has passed. *See*

*McGrath v. DoorDash, Inc.,* No. 19-cv-05279, 2020 WL 6526129, at *4 (N.D. Cal. Nov. 5, 2020) (providing a resolution within 120 days followed by an optional 90-day mediation procedure, and that claimants could "opt-out" and "go back to court" if they preferred). Additionally, the Court is troubled by the lack of mutuality present in the Agreement's MAD procedures. It is far more likely that the batch proceedings will apply to claims raised by employees rather than claims raised by Defendant. Moreover, Defendant's justifications rooted in "reducing fees" are not entirely convincing, (Reply at 11), as "excessive arbitration costs and the logistical challenges of multiple employee claims are problems for the company, not for the employees." *Gustin,* 2026 WL 1948873 at *10. Nor is the Court is also not persuaded by Defendant's argument that concerns about the MAD Procedures are inapplicable here because Plaintiff does not claim to be subject to them in this instance. An unconscionability analysis involves a "prospective analysis" wherein the court examines "the validity of a contractual provision as of the time of the contract is made." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1041 (N.D. Cal. 2022) (collecting cases).

Given the concerns identified above, the Court concludes that Plaintiff has demonstrated moderate substantive unconscionability as it applies to the MAD Procedures. Coupled with the moderate procedural unconscionability arising from the adhesive nature of the contract, the Court concludes that the MAD Procedures are unconscionable.

**C. Severance**

Under California law, "unlawful contractual provisions should be severed and the remainder of the contract enforced." *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1099 (9th Cir. 2024) (citing Cal. Civ. Code § 1599). However, "[i]f the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced." *Id.* 1099–100 (citing *Armendariz,* 99 Cal. 2d at 745). Courts have declined to sever the unconscionable mass arbitration procedure from the remainder

of the arbitration agreement. *See Gustin,* 2026 WL 194887, at *14 (collecting cases). However, in those instances, the party opposing arbitration properly raised a challenge to the delegation clause and/or the arbitration agreement as whole. The Court finds that here, severance is more appropriate in light of the Court's limited scope of review to the unconscionability of the MAD Procedures. *See Heckman,* 120 F.4th at 688 ("California law grants broad leeway to trial courts to remedy unconscionable contracts."). Thus, the Court severs the MAD procedures from the remainder of the Agreement.[2]

**IV. Class Action Waiver**

Finally, the Court finds that the Class Action Waiver is enforceable here. The 2025 Agreement states, "YOU AND EMPLOYER WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED OR ARBITRATED AS A CLASS AND/OR COLLECTIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE OVER ANY SUCH CLAIM." (2025 Agreement at 2.) This waiver is also present in the 2024 Agreement. (ECF No. 6-2, Ex. D at 2.) Class action waivers are enforceable under the FAA. *Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 522–23 (2018). Plaintiff argues that the MAD Procedures conflict with the Class Action/Collective Action Waiver. However, since the Court has severed that provision from the Agreement, the Court finds that it need not consider this argument. Accordingly, the Court will dismiss Plaintiff's class claims without prejudice.

**V. Request to Stay**

Finally, Plaintiff argues that Defendant's request to stay this action is legally improper and premature. Plaintiff contends that because Defendant's removal to this Court was premised on CAFA minimal diversity, success on this Motion would result in

[2] The MAD Procedures include a provision stating that "[i]f there is a final judicial determination that the Company's MAD Procedures in this Section are unenforceable, then the cases will proceed under the AAA Mass Arbitration Supplementary Rules." (2025 Agreement at 5.) Because this Court finds the MAD Procedures unconscionable and severs the entirety of the MAD Procedures from the Agreement, this requirement similarly falls away.

"eliminating" Plaintiff's ability to maintain class allegations. As such, under *Royal Canin v. Wullschleger*, 604 U.S. 22 (2025), and *Faulk v. JELD-WEN, Inc.,* 159 F.4th 618 (9th Cir. 2025), the Court would be divested of original subject matter jurisdiction such that remand would be required. Plaintiff states that she "intends to move for remand on this basis if the Court ultimately compels arbitration of Plaintiff's claims" such that "any ruling on Defendant's request for a stay is premature and improper." (Opp'n at 16.)

In *Royal Canin*, the Supreme Court held that "[w]hen a plaintiff amends her complaint following her suit's removal, a federal court's jurisdiction depends on what the new complaint says." 604 U.S. at 30. In *Faulk*, the Ninth Circuit applied *Royal Canin* to a situation where a defendant removed an action to federal court under CAFA, and plaintiffs subsequently filed an amended complaint to remove the class claims and sought remand. The Ninth Circuit, recognizing that "*Royal Canin* overruled [ ] prior precedent holding that post-removal amendments do not undermine federal jurisdiction" ultimately concluded that post-removal amendments may extinguish jurisdiction such that the district court could no longer rely on minimal diversity under CAFA absent the class allegations. Thus, remand was of the action proper.

Here, the Court is not convinced that *Royal Canin* and *Faulk* make a stay of the instant action improper. Unlike *Faulk*, where the plaintiffs voluntarily removed the class allegations, 159 F.4th at 620, here it is the Court dismissing those claims. Thus, the concern about "deny[ing] a plaintiff the right to remove parties or causes of action" is not at issue here. *Id.* at 624 n. 2. Notably, *Faulk* does not change Ninth Circuit case law that concludes a "denial of class certification does not immediately deprive a district court of CAFA jurisdiction." *Id.* (citation omitted). This compels the Court to find that a stay at this juncture is proper. *See, e.g., Mejia v. Dick's Sporting Goods, Inc.,* No. 2:25-cv-11645-JFW-MAAX, 2026 WL 796910 (C.D. Cal. Mar. 18, 2026) (concluding that *Royal Canin* and *Faulk* did not preclude a staying an action where plaintiff's individual claims were compelled to arbitration and the class claims were dismissed).

## CONCLUSION

For the reasons states above, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion to Compel Arbitration (ECF No. 6) is GRANTED. Plaintiff's individual claims are compelled to arbitration.
2. Plaintiff's putative class claims are DISMISSED without prejudice.
3. Plaintiff's individual claims are STAYED pending arbitration. The Parties are to immediately notify the Court once arbitration of a Plaintiff's claims is complete. The Clerk of Court is directed to administratively close this case.

IT IS SO ORDERED.

Dated: **August 25, 2026**

Daniel J. Calabretta

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC6 – Xatruch25cv03341.mtca_v4